**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEISMAR NORTH AMERICA, INC.,** | ) | **CASE NO.** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE** |
| **v.** | ) | |
| | ) | |
| **GREATER CLEVELAND REGIONAL** | ) | **COMPLAINT FOR DECLARATORY** |
| **TRANSIT AUTHORITY,** | ) | **JUDGMENT, REFORMATION, AND** |
| | ) | **DAMAGES** |
| **Defendant.** | ) | |
| | | **JURY DEMAND ENDORSED HEREON** |

## INTRODUCTION

1. This case concerns a public procurement that went off the rails after the Greater Cleveland Regional Transit Authority ("**Defendant**") abandoned the technical clarification it had given before proposals were submitted.

2. Defendant solicited proposals for a custom Locomotive Work Car to replace an aging rail vehicle. The project required bidders to design and price a specialized machine that would be used to perform repairs throughout the Defendant's service area and be specifically designed to transport maintenance personnel and heavy rail supplies and equipment for rail maintenance operations.

3. Before submitting its proposal, Geismar North America, Inc. ("**Geismar**") identified a material technical issue in Defendant's specifications. Section 4.3.5 appeared to require the work car to tow 90 tons at 40 miles per hour on a 5% grade. That requirement was extraordinary for the type of maintenance work car Defendant was requesting. It would

materially affect the design, required horsepower, engine placement, cost, and feasibility of the vehicle.

4. Geismar did not guess or assume. It followed the procurement process established by Defendant and asked Defendant's designated Contract Administrator, Glenville Manning, to confirm whether Defendant truly intended that requirement. Geismar specifically advised Defendant that a locomotive work car towing 90 tons on a 5% grade would travel approximately 5 miles per hour—not 40 miles per hour—and asked whether the 40-mile-per-hour requirement instead applied on level track. A true and accurate copy of the letter sent to Glenville Manning by Alan D. Reynolds, President of Geismar North America, Inc., is attached as Exhibit A.

5. Defendant's designated Contract Administrator confirmed that the travel-speed requirement meant towing 90 tons at 40 miles per hour on level track, not on a 5% grade. A true and accurate copy of an email containing Glenville Manning's clarification is attached as Exhibit B.

6. Geismar relied on that clarification. It submitted its proposal, engineered the vehicle, and priced the project based on Defendant's written answer.

7. Further, Defendant did far more than simply accept delivery of a finished product. It defined the procurement, answered bidders' technical questions, evaluated competing proposals, selected Geismar's proposal, publicly described the locomotive work car it intended to purchase, exercised contractual design-review authority, approved the design, authorized successive manufacturing milestones, paid approximately seventy percent of the contract price, repeatedly extended Geismar's opportunity to cure post-delivery issues, and only then asserted that the very design it had approved was fundamentally defective.

8. For years, the parties performed under that contract. Defendant approved and paid successive design and manufacturing milestones, the locomotive work car was engineered and built, and the project progressed through delivery, commissioning, corrective work, and Systems Acceptance Testing. Even after delivery, Defendant repeatedly extended Geismar's opportunity to cure identified items while continuing to work with Geismar toward final acceptance.

9. After delivery, disputes arose over remaining commissioning items and over Defendant's changed interpretation of a key technical specification. Geismar acknowledged adjustment, calibration, and commissioning issues inherent in a custom-built rail vehicle, corrected many of those items, continued working through others with Defendant's participation, and submitted a detailed plan to complete the remaining Systems Acceptance Testing. Defendant nevertheless withheld the delivery milestone payment, asserted a claim against Geismar's performance bond, terminated the contract for default, and insisted that Geismar remove the locomotive work car from Defendant's facility rather than complete the remaining commissioning, corrective work, and testing on site.

10. One of Defendant's alleged bases for nonacceptance is the same 5%-grade requirement that Defendant told Geismar before bidding did not mean what Defendant now says it means. Whether as a matter of interpretation, reformation, waiver, estoppel, course of performance, or prevention, Defendant cannot fairly use that changed position to default Geismar after Geismar designed and built the locomotive work car on the course Defendant itself set during procurement.

11. Geismar brings this action for declaratory relief, reformation, and damages arising from Defendant's interpretation and administration of Contract No. 2021-089. Geismar seeks declarations concerning the parties' respective rights and obligations under the contract, including

3

the legal effect of Defendant's written procurement clarification, the parties' subsequent course of performance, Defendant's approval of the locomotive work car's design and manufacture, and Defendant's subsequent declaration of default and termination. In the alternative, if necessary, Geismar seeks reformation of the contract to conform it to the parties' procurement understanding, together with damages resulting from Defendant's breaches of contract and wrongful termination.

## PARTIES, JURISDICTION, AND VENUE

12. Plaintiff Geismar North America, Inc. is a Delaware corporation with its principal place of business in Beaufort, South Carolina.

13. Defendant Greater Cleveland Regional Transit Authority is a regional transit authority organized under Ohio law, with its principal place of business in Cuyahoga County, Ohio.

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events and omissions giving rise to Geismar's claims occurred in this District.

16. Contract No. 2021-089 provides that it is governed by Ohio law.

## DEFENDANT'S NEED FOR A REPLACEMENT LOCOMOTIVE WORK CAR AND THE PROCUREMENT

17. Defendant sought to replace its aging locomotive work car, which had been built in 1943, acquired by Defendant in 1978, and repeatedly refurbished during its service life. In seeking approval for the procurement, Defendant advised its Board that the existing vehicle suffered from obsolete parts, deteriorated electrical systems, corrosion, limited crew accommodations, and

increasing maintenance concerns. Defendant proposed replacing it with a modern locomotive work car that would better serve its maintenance-of-way operations.

18.     Because the project called for a custom-designed rail vehicle rather than an off-the-shelf product, Defendant's technical specifications did not merely describe the desired product— they defined the engineering choices bidders would make.

19.     The distinction between a locomotive work car and a conventional freight locomotive was therefore central to the procurement. A conventional freight locomotive is designed principally to maximize tractive effort and pull trains. A locomotive work car is designed to perform maintenance-of-way functions while retaining powered rail capability, including a working deck, crane integration, storage, and accommodations for maintenance personnel. Defendant consistently described this procurement as the acquisition of a locomotive work car with those maintenance capabilities, both in its solicitation and in its presentations recommending award.

20.     Defendant issued Solicitation No. 2021-089 for a "LOCOMOTIVE WORK CAR" on July 19, 2021, with responses due August 19, 2021. The procurement listing identified Glenville Manning as the Contract Administrator.

21.     Defendant later reported that twenty-nine interested parties downloaded the solicitation and that three vendors ultimately submitted proposals. Defendant advised its Board that proposals would be evaluated on product design and performance, proposer reputation and performance, and pricing. Those criteria necessarily included whether the proposed locomotive work car satisfied the operational objectives Defendant had defined in the procurement.

22.     That distinction made Defendant's technical specifications especially important. A performance requirement appropriate for a conventional freight locomotive could materially

alter—or even defeat—the design of a locomotive work car intended to carry a crane, provide usable working-deck space, transport maintenance personnel, and perform the maintenance functions Defendant sought to procure. The procurement therefore depended upon bidders understanding the performance requirements Defendant intended to impose.

23. The RFP nevertheless contained language that appeared to require the locomotive work car to tow 90 tons at 40 miles per hour on a 5% grade. Read literally, that specification was inconsistent with the maintenance-oriented locomotive work car Defendant otherwise described throughout the procurement and would require a materially different vehicle.

24. Geismar recognized that this was not a minor drafting issue. If enforced literally, the specification would require a fundamentally different vehicle—one designed around freight-locomotive tractive effort rather than the locomotive work car Defendant was soliciting. It would materially affect horsepower, drivetrain configuration, cooling requirements, equipment layout, available working-deck space, overall cost, and the vehicle's intended maintenance function.

**GEISMAR ASKED DEFENDANT TO CLARIFY THE ROUTE BEFORE BIDDING**

25. The RFP's 5%-grade towing requirement was too significant to ignore or assume away. A bidder could not responsibly design or price the locomotive work car without first knowing which performance standard Defendant intended to require because that decision determined the type of vehicle Defendant was asking bidders to build.

26. Geismar therefore followed the process Defendant established. On July 29, 2021, Geismar submitted written questions to Defendant's designated Contract Administrator, Glenville Manning, identified RFP No. 2021-089, and requested clarification of several technical specifications before submitting its proposal.

27. Geismar specifically asked about Section 4.3.5, "Travel Speed." It advised Defendant that, when towing 90 tons on a 5% grade, the locomotive work car's speed would be

reduced to approximately 5 miles per hour, and asked Defendant to confirm that the 40-mile-per-hour towing requirement applied on level track.

28. Geismar's question placed Defendant on direct notice of the material design issue before proposals were due. Geismar was not seeking a post-award concession. It was asking Defendant to identify the performance standard on which bidders should base their designs and pricing.

29. Defendant answered through the designated procurement official that the requirement was for towing 90 tons at 40 miles per hour on level track—not on a 5% grade. Defendant did not qualify, limit, withdraw, or correct that answer before proposals were submitted.

30. Defendant's answer established the technical premise for Geismar's proposal. Geismar designed, engineered, and priced the locomotive work car on the understanding Defendant itself provided: the vehicle had to tow 90 tons at 40 miles per hour on level track, while towing speed on a 5% grade would be materially lower.

31. Geismar relied on Defendant's written clarification in preparing the proposal's engineering, performance assumptions, pricing, and overall design. Had Defendant confirmed that the specification required 40 miles per hour while towing 90 tons on a 5% grade, Geismar would have had to propose a materially different vehicle or decline to submit a proposal.

32. Defendant then evaluated Geismar's proposal against competing submissions and selected Geismar as the successful bidder. Before award, Defendant did not advise Geismar that its written clarification had been mistaken, withdrawn, superseded, or inconsistent with the vehicle Defendant intended to buy.

**GEISMAR'S PROPOSAL FOLLOWED DEFENDANT'S CLARIFICATION**

33. Geismar's proposal reflected the locomotive work car Defendant had chosen to procure. Rather than proposing a conventional freight locomotive designed primarily for tractive

7

effort, Geismar proposed a specialized maintenance vehicle with rail propulsion, operator and crew accommodations, a working deck, crane capability, and the maintenance functionality Defendant had identified as essential to the project, and in compliance with the technical specification provided and clarified by the Defendant.

34. Geismar's technical proposal reflected the distinction established during procurement. The locomotive work car was designed to achieve a maximum self-propelled travel speed of approximately 40 miles per hour on level track while preserving the tractive effort, deck space, crane capability, and maintenance functionality required of a locomotive work car. When towing 90 tons on a 5% grade, the vehicle would achieve substantially lower speeds, consistent with Defendant's pre-bid clarification.

35. That proposal implemented the understanding established during the procurement process. It provided the level-track travel speed Defendant had confirmed and the reduced towing speed on a 5% grade that Geismar had explained before bidding. Defendant later evaluated and accepted that proposal without objection.

36. From the outset, Defendant sought a locomotive work car—not a conventional freight locomotive. Geismar proposed that locomotive work car. Defendant evaluated the proposal, selected it over competing proposals, publicly presented it to its Board as the replacement for Defendant's existing locomotive, approved design and manufacturing milestones, paid approximately seventy percent of the contract price, and only after delivery asserted that the resulting vehicle was fundamentally defective.

37. Thus, from the beginning, the parties' practical bargain was not for a conventional freight locomotive that sacrificed work-car functionality to maximize tractive effort. It was for the

8

locomotive work car Defendant solicited, clarified during procurement, evaluated against competing proposals, and ultimately selected for manufacture.

## DEFENDANT ACCEPTED GEISMAR'S PROPOSAL AND AWARDED THE CONTRACT

38. Defendant evaluated proposals submitted in response to RFP No. 2021-089 using published criteria that included product design and performance, proposer reputation and performance, and pricing. Geismar's proposal was therefore evaluated not only for cost, but also for the very design and performance characteristics Defendant now contends were fundamentally defective.

39. By the time Defendant considered award, it possessed Geismar's proposal, pricing, technical submissions, and its own procurement record, including the written clarification issued by Contract Administrator Glenville Manning concerning Section 4.3.5.

40. On or about April 12, 2022, Defendant presented the proposed award to its Organizational, Services & Performance Monitoring Committee. Consistent with the procurement, Defendant described the project as the acquisition of a modern locomotive work car to replace its aging maintenance vehicle. The presentation emphasized the proposed work car's crane, flat working deck, improved visibility, increased crew capacity, and versatility as a maintenance vehicle—not the characteristics of a conventional freight locomotive.

41. Two weeks later, Defendant's staff formally recommended that the Board award the contract to Geismar.

42. On April 26, 2022, Defendant's Board of Trustees adopted Resolution No. 2022-33 and authorized Contract No. 2021-089 with Geismar North America, Inc. for the purchase of the locomotive work car in an amount not to exceed $3,291,204.80.

43. At no point before awarding the contract did Defendant advise Geismar that the written clarification concerning Section 4.3.5 had been withdrawn, modified, or rejected.

44. Nor did Defendant advise Geismar that it expected a vehicle materially different from the one described in Geismar's proposal and reflected in Defendant's own presentations to its Board.

45. Instead, both parties proceeded into performance on the understanding established during procurement: Geismar would design and manufacture the locomotive work car Defendant had requested, consistent with the technical clarification Defendant had provided before bids were submitted.

46. For the next several years, the parties remained on that course. Geismar undertook the engineering and manufacture of the locomotive work car while Defendant exercised its contractual design-review authority, approved the engineering path, authorized successive manufacturing milestones, and made progress payments.

## THE PARTIES PERFORMED THE CONTRACT IN ACCORDANCE WITH THE PROCUREMENT

47. Following execution of Contract No. 2021-089, Defendant issued its Notice to Proceed effective October 26, 2022, authorizing Geismar to begin performance.

48. The locomotive work car was not an off-the-shelf purchase. It was a custom design-and-build project in which Defendant retained contractual rights to review and approve Geismar's design before the project advanced through manufacturing.

49. The parties' payment structure reflected that design-review process. Two early payment milestones were tied directly to design: "Submission of Intermediate Design" and "Submission and Approval of Final Design."

50.     Defendant therefore did not merely wait at the station for a finished vehicle. The contract reserved to Defendant the right to review and approve the locomotive work car's design before manufacturing progressed, thereby allowing Defendant to identify and require correction of any fundamental design concern before fabrication begun.

51.     Defendant exercised those rights. It approved and paid the Initial Design and Design Approval milestones before Geismar proceeded through later manufacturing milestones. During that review, Defendant did not direct Geismar to redesign the locomotive work car to tow 90 tons at 40 miles per hour on a 5% grade.

52.     Defendant also approved and paid the Frame and Trucks, Crane/Engine/Transmission Installation, and Pre-Shipment Inspection milestones.

53.     In total, Defendant paid Geismar $2,303,843.36 under Contract No. 2021-089 before delivery of the locomotive work car.

54.     Those approvals mattered. They confirmed that Geismar was proceeding with the design and manufacturing path Defendant had reviewed, approved, and funded.

55.     At no point during the engineering, design-review, fabrication, or milestone-approval process did Defendant advise Geismar that the locomotive work car was being designed around the wrong fundamental performance requirement.

56.     Nor did Defendant notify Geismar that it considered the pre-bid clarification concerning Section 4.3.5 withdrawn, superseded, or incorrect.

57.     Instead, for nearly three years, Defendant reviewed the project, approved design and manufacturing milestones, and made progress payments while Geismar designed and manufactured the locomotive work car Defendant had solicited and selected.

11

58.     By June 2025, Geismar completed manufacture of the locomotive work car and delivered it to Defendant for post-delivery inspection, commissioning, and Systems Acceptance Testing ("**SAT**") as contemplated by the contract.

### DELIVERY MARKED THE BEGINNING OF THE ACCEPTANCE PROCESS, NOT THE END OF PERFORMANCE

59.     Under the contract, delivery did not automatically constitute final acceptance. Rather, the contract contemplated post-delivery inspection and testing to verify that the locomotive work car satisfied the contractual requirements before final acceptance.

60.     As contemplated by the contract, Defendant began evaluating the locomotive work car after delivery.

61.     During that process, Defendant identified two categories of issues. Many involved adjustment, calibration, integration, component performance, and workmanship matters commonly addressed during commissioning of a custom-built rail vehicle. Others involved Defendant's interpretation of technical specifications, including the travel-speed requirement.

62.     The parties' conduct reflected a common understanding that the project remained in the acceptance and commissioning phase. Defendant continued to communicate with Geismar regarding corrective work, and Geismar continued to devote engineering resources, technical personnel, subcontractors, and suppliers to completing the project.

63.     Throughout this period, neither party treated the project as complete. Rather, both parties continued working toward final acceptance of the locomotive work car.

### THE PARTIES WORKED COOPERATIVELY TO RESOLVE POST-DELIVERY ISSUES

64.     On August 1, 2025, Defendant issued a Notice of Non-Conforming Goods and Services under Section 12(a) of the contract and requested cure within ten calendar days, while

stating that additional cure time would be provided if Geismar requested it and showed that additional time was reasonably necessary.

65.     Geismar responded by investigating the reported issues, coordinating with suppliers and subcontractors, mobilizing personnel, and working with Defendant's technical personnel to address the items Defendant identified.

66.     The parties remained in regular communication regarding those efforts. Geismar provided written progress reports, proposed schedules and target completion dates, while Defendant inspected Geismar's work, provided technical personnel, and repeatedly extended Geismar's cure period.

67.     Throughout that process, Defendant withheld payment of the separate shipment/delivery milestone. Geismar had delivered the locomotive work car and invoiced Defendant $658,240.96 for that milestone on June 30, 2025.

68.     On August 7, 2025, Geismar expressly requested that Defendant process the delivery-milestone payment. Geismar distinguished the completed shipment milestone from the subsequent final-acceptance milestone and advised Defendant that it would not invoice the final-acceptance milestone until the parties agreed that all defects had been closed.

69.     Defendant did not pay. Geismar nevertheless continued performing corrective work at its expense and working with Defendant toward completion and final acceptance.

70.     The parties' conduct reflected a shared understanding that the locomotive work car remained in the commissioning and acceptance phase and that identified issues would be addressed through continued engineering, testing, adjustment, and inspection. Defendant iteratively identified issues to be addressed and Geismar successfully resolved many of the identified items while others remained under active investigation and engineering review.

71. On October 10, 2025, after continued corrective work, Geismar again demanded payment of the delivery invoice and requested payment within five business days. Geismar again explained that the separate, uninvoiced final-acceptance milestone remained available to protect Defendant's interest in completion of the acceptance process.

72. Defendant still did not pay. Instead, it retained possession of the locomotive work car and continued participating in and accepting Geismar's corrective efforts without paying the shipment/delivery milestone.

73. By December 10, 2025, Geismar advised GCRTA in writing that Invoice No. 000311476 was well overdue and that continued nonpayment would leave Geismar no choice but to declare GCRTA in default of the Contract.

74. Defendant did not cure its nonpayment. Geismar nonetheless continued working toward completion and final acceptance and did not abandon the project or refuse further performance.

75. By early 2026, the parties proceeded to Systems Acceptance Testing, with remaining issues to be evaluated through that process and addressed through further testing, adjustment, documentation, or corrective work before final acceptance.

### THE PROJECT LEFT THE COURSE ESTABLISHED DURING PROCUREMENT

76. In February 2026, the parties conducted Systems Acceptance Testing.

77. The locomotive work car was a newly designed and specialized vehicle with operating systems and functions that required appropriate familiarization and training. During commissioning and testing, Geismar observed that certain questions and concerns raised by GCRTA personnel appeared to result, at least in part, from unfamiliarity with the vehicle's operation and the new procedures described in the applicable manuals. Geismar therefore

14

understood that continued instruction, review of the operating materials, and additional hands-on familiarization would be part of the process of completing commissioning and acceptance.

78.     The SAT process identified remaining open items. Geismar disputed some of Defendant's conclusions, but it continued to work toward completion rather than abandon the project.

79.     Among the items Defendant identified during SAT were "Engine Performance" and "Travel Speed."

80.     Defendant's SAT materials listed, among other things, "Diesel Engine Pull load 40mph@5% grade" and stated that "Travel Speed" was "Not achieved," thereby applying the 5%-grade interpretation Defendant had disclaimed before proposals were submitted.

81.     Those asserted failures returned the parties to the very issue Geismar had identified before bids were submitted: whether the locomotive work car was required to tow 90 tons at 40 miles per hour on level track or on a 5% grade.

82.     Defendant's SAT position conflicted with the written clarification it had provided during procurement. Before Geismar submitted its proposal, Defendant had told Geismar that the requirement was "Towing 90 tons at 40MPH on level track, not 5% grade."

83.     Geismar's design was consistent with that clarification. Defendant's later SAT position was not.

84.     After the February 2026 SAT, Geismar did not refuse further work. On March 6, 2026, Geismar submitted a written plan to address the remaining SAT items and requested the week of April 20, 2026, to complete SAT.

15

85.     Geismar's March 6 letter acknowledged prior quality issues, stated that the items from Defendant's earlier notices had been resolved before SAT, and proposed a path to address the remaining SAT items.

86.     Before Geismar submitted that proposal, on February 23, 2026, Defendant had already submitted a claim against Geismar's performance bond, asserting that the locomotive work car failed acceptance testing and had "no value to Defendant whatsoever."

87.     Defendant then pressed the surety for a response and took the position that Geismar had admitted the locomotive was not built to Defendant's specifications because it could not meet the 5%-grade, 40-mile-per-hour towing requirement.

88.     That position disregarded Defendant's own procurement clarification, the work-car design Defendant selected, the design-review rights Defendant exercised, the milestones Defendant approved and paid, and the course of performance that followed.

89.     On April 2, 2026, Defendant invited Geismar and the surety to inspect the locomotive work car but refused to permit further SAT during that visit.

90.     Defendant then demanded that Geismar remove the locomotive work car from Defendant's facility, while continuing to assert that the vehicle had not achieved final acceptance.

91.     By declining to resume SAT, directing Geismar to remove the locomotive work car from Defendant's facility, and conditioning completion of the remaining acceptance work on removal of the locomotive, Defendant materially hindered Geismar's ability to complete the acceptance process in the manner the parties had followed during the post-delivery commissioning period.

92.     In May of 2026, Defendant sent a Notice of Termination of Contract No. 2021-089 for alleged default.

93. Even after issuing the Notice of Termination, Defendant permitted Geismar personnel to return to its facility on July 6 and 7, 2026, to inspect and perform work on the locomotive work car. During that visit, Geismar replaced discharged batteries, started the locomotive, verified the operation of major systems, corrected multiple open items, and evaluated the remaining items identified during the SAT process.

94. The July work confirmed Geismar's position that the remaining commissioning, testing, and corrective work could continue at Defendant's facility. Geismar identified no condition requiring removal of the locomotive work car and remained prepared to complete the remaining work through coordinated on-site access, dynamic testing, and resolution of items requiring Defendant's approval.

95. Based on its evaluation during and following the July 6–7 visit, Geismar believed that the remaining commissioning, corrective work, and testing could be completed in approximately four weeks, provided Defendant approved the proposed work, afforded the necessary access, and cooperated in coordinating the remaining testing and acceptance activities.

96. The parties' dispute thus concerns not whether Geismar remained willing to pursue corrective work, but whether Geismar was required to remove the locomotive work car from Defendant's facility before completing the remaining commissioning, corrective work, and testing. Throughout the post-delivery acceptance process, the parties had addressed identified issues through engineering, testing, adjustment, inspection, and corrective work at Defendant's facility. Defendant nevertheless insisted that Geismar remove the locomotive work car before completing the remaining work.

97. Contract No. 2021-089 does not require Geismar to remove and relocate the locomotive work car from Defendant's facility as a condition of completing the remaining

17

commissioning, corrective work, dynamic testing, or acceptance activities. Defendant has identified no contractual provision, technical requirement, or safety condition requiring such removal.

98.     Defendant's default position rests on a changed interpretation and administration of the procurement. It seeks to enforce a conventional-locomotive performance requirement against the locomotive work car Geismar designed, priced, and built in reliance on Defendant's written pre-bid clarification, while insisting on a method of completing the remaining acceptance work that departed from the parties' post-delivery course of performance.

## DEFENDANT WITHHELD PAYMENT AND CAUSED GEISMAR DAMAGES

99.     Defendant also withheld payment due under the contract.

100.     The parties' payment schedule treated shipment/delivery as a separate milestone from final acceptance.

101.     The shipment/delivery milestone was 20% of the contract price, or $658,240.96.

102.     Geismar delivered the locomotive work car to Defendant and invoiced Defendant for the shipment/delivery milestone.

103.     Defendant refused to pay that invoice.

104.     Defendant's refusal to pay the shipment/delivery milestone was not justified by the absence of final acceptance because the contract treated shipment/delivery and final acceptance as separate payment milestones.

105.     Defendant's nonpayment deprived Geismar of contract funds due for work already performed and accepted through the shipment/delivery stage.

106.     Defendant's performance-bond claim and subsequent default termination further damaged Geismar by exposing it to bond-related costs, reputational and commercial harm, and additional losses to be proven at trial.

18

107.     As a result of Defendant's conduct, Geismar has suffered damages in an amount to be determined at trial, including at least the unpaid $658,240.96 shipment/delivery milestone, additional contract amounts wrongfully withheld, and consequential or incidental damages recoverable under the contract and Ohio law.

108.     An actual controversy exists regarding the parties' rights and obligations under Contract No. 2021-089, including the proper interpretation of the travel-speed requirement, the effect of Defendant's pre-bid clarification, the enforceability of Defendant's default position, Defendant's withholding of payment, and whether Defendant properly insisted that Geismar remove the locomotive work car from Defendant's facility rather than complete the remaining commissioning, corrective work, and SAT-related testing in the manner reflected by the parties' post-delivery course of performance.

## CONDITIONS PRECEDENT

109.     Geismar has performed all conditions precedent required of it under Contract No. 2021-089 or has been excused from performing such conditions by Defendant's acts, omissions, prevention, waiver, and prior material breach.

110.     To the extent any condition precedent to payment, acceptance, or completion remained unsatisfied, such condition was excused because Defendant prevented or materially hindered Geismar's ability to satisfy it by, among other things, insisting that Geismar remove the locomotive work car from Defendant's facility before completing remaining commissioning, corrective work, and SAT-related testing, withholding contract payments, asserting default while corrective work remained capable of completion, and otherwise materially altering the post-delivery acceptance process reflected by the parties' course of performance.

19

111. Geismar has satisfied all contractual notice requirements applicable to its claims, or such requirements have been waived, excused, or otherwise fulfilled through the parties' extensive written correspondence and course of dealing.

**DEFENDANT WRONGFULLY SUSPENDED AND TERMINATED A SEPARATE LINE CAR CONTRACT BASED ON CONCERNS ABOUT THE LOCOMOTIVE WORK CAR**

112. Geismar and Defendant entered into Contract No. 2024-041 for the design, manufacture, and delivery of a custom Line Car at a not-to-exceed contract price of $5,165,257.

113. Contract No. 2024-041 was a separate agreement governed by its own technical specifications, delivery requirements, submittal requirements, payment structure, and termination provisions.

114. The work required under Contract No. 2024-041 included engineering and design development, coordination of vehicle components and systems, preparation of technical submittals, and advancement of the Line Car through design-review, manufacturing, inspection, delivery, training, and acceptance.

115. In performing Contract No. 2024-041, Geismar commenced engineering and design-development work, evaluated the Contract's technical requirements, developed vehicle and component configurations, obtained technical and commercial information from suppliers, coordinated component and system interfaces, and prepared for the design-review and manufacturing stages.

116. As part of the project's design-development process, the parties scheduled a Preliminary Design Review.

117. On August 1, 2025, Defendant directed Geismar to pause performance under Contract No. 2024-041. Defendant did not identify any breach or default under Contract No. 2024-

20

041 as the basis for that directive and instead tied the directive to concerns arising under the parties' separate Locomotive Work Car contract.

118. Defendant thereafter repeatedly directed Geismar to continue the pause, postponed the scheduled Preliminary Design Review, and did not authorize Geismar to resume performance despite Geismar's requests to proceed.

119. Before threatening termination for default, Defendant did not provide Geismar with notice under Section 13(a) identifying any failure of performance under Contract No. 2024-041 and did not afford Geismar the contractual ten-day period following such notice to address the asserted failure.

120. On December 1, 2025, Defendant directed that performance under Contract No. 2024-041 cease immediately and proposed that the termination be treated as a termination for convenience under Section 13(b). Defendant stated that, absent agreement to that treatment, it would terminate the Contract for default.

121. Geismar denied that it was in default, objected to any termination for default because Defendant had not complied with Section 13(a), and agreed that Defendant's termination would be treated as a termination for convenience under Section 13(b), without waiving its right to payment for its prior performance.

122. Section 13(b) permitted Defendant to terminate performance for convenience but preserved Defendant's obligation to compensate Geismar for its prior performance.

123. Before Defendant suspended and terminated Contract No. 2024-041, Geismar performed engineering, design-development, project-management, component-selection, supplier-coordination, technical-submittal, and related work required by and specifically attributable to that Contract.

21

124.    Defendant's direction that Geismar cease performance and its postponement of the design-review process prevented Geismar from advancing the work to the Contract's subsequent design-review and progressive-payment milestones.

125.    Defendant has not paid Geismar the amounts due under Section 13(b) for Geismar's performance before the termination notice.

126.    As a direct and proximate result of Defendant's failure to pay for Geismar's prior performance, Geismar has suffered damages in an amount to be proven at trial, including the contractually allocable amount attributable to the engineering, design-development, project-management, component-selection, supplier-coordination, technical-submittal, and related work Geismar performed before termination.

## COUNT I – DECLARATORY JUDGMENT
### (28 USC §§ 2201-2202)

127.    Geismar incorporates by reference the preceding paragraphs as though fully rewritten herein.

128.    An actual and justiciable controversy exists between the parties concerning their respective rights and obligations under Contract No. 2021-089. The controversy includes the proper interpretation and legal effect of Defendant's pre-bid written clarification of Section 4.3.5, the effect of the parties' subsequent course of performance, whether Defendant may enforce Section 4.3.5 contrary to that clarification, whether Defendant properly withheld payment, and whether Defendant properly insisted that Geismar remove the locomotive work car from Defendant's facility before completing the remaining commissioning, corrective work, and SAT-related testing.

129.    The controversy is real, immediate, and substantial. Defendant has asserted that Geismar failed to satisfy the contract because, among other things, the locomotive work car did

22

not meet a requirement to tow 90 tons at 40 miles per hour on a 5% grade. Geismar contends that Defendant expressly clarified before bids were submitted that the applicable requirement was towing 90 tons at 40 miles per hour on level track.

130. The parties further dispute whether Contract No. 2021-089 authorizes Defendant to require Geismar to remove and relocate the locomotive work car as a condition of completing the remaining commissioning, corrective work, dynamic testing, and acceptance activities; whether Defendant properly withheld contract payments; whether Defendant materially hindered completion of the acceptance process by imposing that condition; whether Defendant properly declared default and terminated Contract No. 2021-089; and whether Defendant properly asserted a claim against Geismar's performance bond.

131. These disputes affect the parties' present contractual rights and obligations and are appropriate for declaratory relief.

132. Geismar is entitled to a declaration that:

a. Defendant's pre-bid written clarification governs or, at minimum, informs the interpretation and enforceability of Section 4.3.5;

b. Defendant may not enforce Section 4.3.5 as requiring the locomotive work car to tow 90 tons at 40 miles per hour on a 5% grade after clarifying before bids that the requirement applied on level track, accepting Geismar's proposal prepared in reliance on that clarification, approving the resulting design, and permitting performance to proceed on that basis;

c. Defendant wrongfully withheld payment of the shipment/delivery milestone;

d. Contract No. 2021-089 does not authorize Defendant to condition Geismar's completion of the remaining commissioning, corrective work, dynamic testing, or acceptance activities on Geismar's removal and relocation of the locomotive work car from Defendant's facility;

e. Defendant materially hindered completion of the contractual acceptance process by imposing that unauthorized condition, notwithstanding the parties' post-delivery course of performance and Geismar's demonstrated ability to continue corrective work on site;

f. Defendant wrongfully declared default and terminated the contract to the extent those actions were based upon an interpretation contrary to Defendant's own procurement clarification or upon conditions Defendant materially hindered Geismar from satisfying by altering the manner in which the remaining acceptance work could be completed; and

g. the parties' respective rights and obligations are as declared by this Court.

## COUNT II – REFORMATION

133. Geismar incorporates by reference the preceding paragraphs as though fully rewritten herein.

134. In the alternative to Count I, the written contract should be reformed to reflect the parties' actual agreement and understanding concerning the travel-speed requirement.

135. Before bids were submitted, Geismar asked Defendant whether Section 4.3.5 required 40 miles per hour while towing 90 tons on a 5% grade, or instead on level track.

136. Defendant answered that the requirement was "Towing 90 tons at 40MPH on level track, not 5% grade."

137. Geismar relied on that answer in preparing its proposal, pricing, engineering, and manufacturing plan.

138. Defendant accepted Geismar's proposal and awarded the contract without withdrawing or correcting that clarification.

139. To the extent the executed contract retained language inconsistent with Defendant's clarification, that language does not reflect the parties' actual agreement concerning the travel-speed requirement.

140. The inconsistency resulted from mutual mistake or, alternatively, Geismar's mistake coupled with Defendant's inequitable attempt to enforce a requirement contrary to its own written clarification.

24

141.    Geismar is entitled to reformation of Contract No. 2021-089 to confirm that the travel-speed towing requirement applies on level track, not on a 5% grade.

<b><u>COUNT III – BREACH OF CONTRACT</u></b><br><b>(LOCOMOTIVE WORK CAR)</b>

142.    Geismar incorporates by reference the preceding paragraphs as though fully rewritten herein.

143.    Contract No. 2021-089 is a valid and enforceable contract between Geismar and Defendant.

144.    Geismar performed its contractual obligations, substantially performed them, or was excused from any further performance by Defendant's acts, omissions, waiver, course of performance, material hindrance, interference, and prior material breach.

145.    Defendant breached the contract by failing and refusing to pay Geismar the $658,240.96 shipment/delivery milestone after Geismar delivered the locomotive work car.

146.    Defendant further breached the contract by insisting that Geismar remove the locomotive work car from Defendant's facility before completing the remaining commissioning, corrective work, and SAT-related testing, notwithstanding the parties' post-delivery course of performance and Geismar's demonstrated ability to continue corrective work on site.

147.    Defendant further breached the contract by declaring default and terminating Contract No. 2021-089 while Geismar remained willing and able to pursue the remaining corrective work and while Defendant was insisting upon a method of completion that departed from the parties' administration of the post-delivery acceptance process.

148.    Defendant's course of performance confirmed both the design Geismar was to provide and the manner in which the parties would address post-delivery acceptance issues. Defendant exercised contractual review rights, approved the design, approved successive

25

manufacturing milestones, made corresponding progress payments, repeatedly extended Geismar's opportunity to cure after delivery, and participated in on-site inspection, testing, adjustment, and corrective work. Only thereafter did Defendant assert that the approved design failed to satisfy a materially different performance requirement and insist that Geismar remove the locomotive work car before completing the remaining work.

149.   Defendant waived any right to insist upon a contrary interpretation of the travel-speed requirement after clarifying that requirement before bids, accepting Geismar's proposal, approving design and manufacturing milestones, and allowing performance to continue on that basis.

150.   Defendant further breached the contract and the implied duty of good faith and fair dealing by attempting to enforce a material technical requirement contrary to its own pre-bid clarification, withholding payment while demanding continued performance, insisting that Geismar remove the locomotive work car before completing the remaining commissioning, corrective work, and SAT-related testing, and then relying on the resulting nonacceptance to declare default.

151.   Defendant's breaches damaged Geismar in an amount to be proven at trial, including at least the unpaid $658,240.96 shipment/delivery milestone, other unpaid contract amounts, additional costs incurred in attempting to complete performance, and other damages recoverable under the contract and Ohio law.

<u>COUNT IV – EQUITABLE ESTOPPEL</u>

152.   Geismar incorporates by reference the preceding paragraphs as though fully rewritten herein.

26

153.    Defendant represented to Geismar before bids were submitted that the Section 4.3.5 travel-speed requirement meant towing 90 tons at 40 miles per hour on level track, not on a 5% grade.

154.    Defendant made that representation through the Contract Administrator it identified for the procurement.

155.    Geismar reasonably relied on Defendant's written representation in preparing its proposal, pricing the work, engineering the locomotive work car, manufacturing the vehicle, and continuing performance under the contract after Defendant approved successive design and manufacturing milestones.

156.    Defendant knew or reasonably should have known that bidders would rely on its written clarification in designing and pricing their proposals.

157.    Defendant accepted Geismar's proposal, approved the resulting design and manufacturing milestones, repeatedly extended Geismar's opportunity to cure after delivery, and paid more than $2.3 million without withdrawing or correcting the clarification.

158.    Defendant later took the inconsistent position that the locomotive work car was nonconforming, in part because it did not satisfy the 40-mile-per-hour towing requirement on a 5% grade.

159.    Geismar has been prejudiced by Defendant's inconsistent position.

160.    Defendant should be equitably estopped from asserting that Section 4.3.5 required towing 90 tons at 40 miles per hour on a 5% grade or from relying on that interpretation to justify withholding payment, refusing acceptance, declaring default, terminating the contract, or pursuing recovery against Geismar or its surety.

27

## COUNT V – BREACH OF CONTRACT
### (LINE CAR)

161. Geismar incorporates by reference the preceding paragraphs as though fully rewritten herein.

162. Contract No. 2024-041 is a valid and enforceable contract between Geismar and Defendant.

163. Before Defendant directed Geismar to suspend performance, Geismar performed engineering, design-development, project-management, supplier-coordination, and other work required to develop the custom Line Car and prepare the project for the contractual design-review process.

164. On December 1, 2025, Defendant stated that it was terminating Contract No. 2024-041 and proposed that the termination proceed as one for convenience under Section 13(b), while reserving a threatened termination for default if the parties did not reach agreement.

165. Geismar disputed any basis for termination for default because Defendant had provided no notice of default under Contract No. 2024-041 and had prevented further progress by directing Geismar to pause performance and postponing the Preliminary Design Review.

166. Geismar nevertheless accepted Defendant's proposal to proceed with termination for convenience under Section 13(b) and ceased further performance.

167. Section 13(b) authorized Defendant to terminate the Contract for convenience but preserved Defendant's obligation to compensate Geismar for its prior performance.

168. Defendant has not compensated Geismar for the engineering, design-development, project-management, supplier-coordination, and other performance Geismar completed before termination.

28

169.    As a direct and proximate result of Defendant's breach, Geismar has suffered damages in an amount to be determined at trial, including the contractual value of its performance completed before termination, together with interest and any other amounts recoverable under Contract No. 2024-041 and Ohio law.

### PRAYER FOR RELIEF

Geismar respectfully requests that the Court enter judgment in its favor and against Defendant and grant the following relief:

a. declare that Defendant may not interpret or enforce Section 4.3.5 inconsistently with its written procurement clarification, Geismar's proposal submitted in reliance on that clarification, the design Defendant approved, and the parties' subsequent course of performance;

b. declare that Defendant may not rely on a contrary 5%-grade interpretation to withhold payment, refuse acceptance, declare default, terminate Contract No. 2021-089, or assert claims against Geismar or its surety;

c. reform Contract No. 2021-089 to reflect Defendant's pre-bid clarification;

d. declare that Defendant wrongfully withheld the $658,240.96 shipment/delivery milestone;

e. declare that Contract No. 2021-089 does not authorize Defendant to condition Geismar's completion of the remaining commissioning, corrective work, dynamic testing, or acceptance activities on Geismar's removal and relocation of the locomotive work car from Defendant's facility;

f. declare that Defendant materially hindered Geismar's completion of the contractual acceptance process by insisting that Geismar remove the locomotive work car from

29

Defendant's facility before completing the remaining commissioning, corrective work, and SAT-related testing;

g. declare that Defendant wrongfully declared default and terminated Contract No. 2021-089 to the extent those actions were based on Defendant's contrary 5%-grade interpretation or on conditions Defendant materially hindered Geismar from satisfying by altering the manner in which the remaining acceptance work could be completed;

h. award Geismar compensatory damages in an amount to be proven at trial, including at least $658,240.96 in unpaid contract amounts;

i. award Geismar damages for Defendant's breach of Contract No. 2024-041, including the contractual value of Geismar's engineering, design-development, project-management, supplier-coordination, and other performance completed before termination, in an amount to be proven at trial;

j. award pre-judgment and post-judgment interest as allowed by law;

k. award costs and any recoverable attorneys' fees to the extent permitted by contract or law; and

l. grant all other relief the Court deems just and proper.

## JURY DEMAND

Geismar demands a trial by jury on all issues so triable.

August 10, 2026                                    Respectfully submitted,

                                         */s/ Robert M. Stefancin*
                                         Robert M. Stefancin (0047184)
                                         rstefancin@bernsteinlaw.com
                                         Jeffrey A. Panehal (0090293)
                                         jpanehal@bernsteinlaw.com
                                         WH BURKLEY, LLP
                                         1500 West Third Street, Suite 300
                                         Cleveland, Ohio 44113
                                         Telephone: (216) 928-2893
                                         Facsimile: (412) 456-8135

                                         *Counsel for Plaintiff*
                                         *Geismar North America, Inc.*